# Davis v. Commonwealth.

(Decided Oct. 9, 1936.)

CHARLES FERGUSON for appellant.

B. M. VINCENT, Attorney General, and J. J. LEARY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

Appellant was indicted and tried for the murder of Mose Nelson, found guilty of manslaughter and sentenced to five years in the penitentiary. She appeals.

Appellant admits that on March 10, 1936, she shot and killed Nelson, but contends that at the time she fired the fatal shot she believed herself to be in danger of suffering some great bodily harm.

Since appellant was the only witness to the oc-

currences leading to the homicide, her testimony, followed by a statement of physical proofs as detailed by other witnesses, will serve to lay the background.

Accused and her husband, Will Davis, at the time of the homicide lived some distance from a roadway leading by the home of a Mr. Rhea, passing the Davis home on to a public highway. The Davis home was situated on a hill, and a passway led from the roadway to the house, passing a barn in front and to the west of the house. The house only had two rooms, one used for a kitchen and dining room and the other a bedroom. A porch ran the entire length of the front of the house upon which two doors opened, one from the kitchen and the other from the bedroom. The Rheas and Nelsons appear to have been the nearest neighbors, one family living in one and the other in an opposite direction from the Davis home.

On the day of the homicide the husband of appellant and Luke Hodges, a colored boy, were plowing ground on the adjacent farm of Mr. Rhea. Eliza Champion was visiting the Davis home, and at noon she and appellant prepared dinner and the husband came home to his meal and returned to his work. Soon thereafter the Champion girl left the house, and in about an hour appellant began some laundry work in the kitchen. While thus engaged, her attention was attracted by noise made by her chickens, and looking up from her work she saw Nelson coming toward the back door, which was open. There was also a screen door which was closed but not fastened. As Nelson approached appellant hurried to the door and succeeded in latching the screen. Nelson endeavored to force open the screen door. Appellant ordered him to leave, but he insisted that he was coming in. Some reference was made to certain difficulties theretofore occurring between the two, and during the passage of words appellant succeeded in closing and fastening the inner door, and stood for a brief time listening to ascertain whether or not Nelson had left. It finally occurred to her that Nelson might come to the front door which was also open, and she ran to close it, but deceased had gotten inside. She says that he seized her by the wrist and she fought to get loose; that he struggled with her and tore her clothing, but she finally freed herself and grabbed the handle of a cross-cut saw and began to

strike him "over the head and just anywhere I could and as fast and hard as I could," and after a time succeeded in getting him out the front door. Nelson went off the porch and started north along the front porch for about 18 steps, during all this time threatening and abusing her. He crossed the passway leading to the barn, and at the distance above mentioned he turned and came back toward the house "threatening and shaking his hand at her."

Appellant says that as soon as he turned back toward the house she reached for a single-barreled shotgun which was standing behind the front door and ordered Nelson to stop. She says he continued toward the house saying that she "would not do anything she said she would do." She again called on him to stop, but he kept advancing, until he had reached near to the north end of the porch, and she says that she then raised the gun, shut her eyes and fired. She thought she had missed him, but says that he turned his left side to her, walked back to about the point where he had first turned in the passway and sank on his hands and knees and his face "settled down on the ground." She went to the field where her husband and Hodges were working and asked the latter to go and tell John Nelson, son of the deceased, that she had killed his father. Hodges objected, and suggested that she send the message by Mr. Rhea. Davis took out his team and he and appellant started home, stopping on the way at the Rhea home and conveying the news to him; he sent Mrs. Rhea to the home of the son and indirectly to John Nelson, who went to the scene and shortly thereafter carried his father's body home.

Shortly after the killing appellant and her husband went to Smithland, the county seat, and visited the offices of the sheriff and county attorney, ostensibly for the purpose of making known to them what had occurred. Not finding either of those officers, they went to the office of an attorney, who advised them to go to the coroner, and finding him, related to that officer what had happened.

Appellant testified as to a previous difficulty between herself and Nelson which had occurred in 1930. She said, in regard thereto:

"I was coming along the road and he was there and

jumped out on me. I didn't know it was him at first, and he called out and said 'Wait' and I walked fast and he started to run and I run until I got to Mr. Rhea's barn and ran in and he came in and said 'God damn you I have got you now.' Mrs. Rhea happened to be in the barn and she ran Nelson away."

Appellant testified that she had not spoken to Nelson from November, 1930, until the day of the homicide. Records of the Livingston county court were introduced and showed that on November 18, 1930, Nelson had pleaded guilty to a warrant charging breach of the peace, the commission of which seems to have involved the occurrence related by appellant, and had paid a fine of $10. The records also showed that appellant had later procured a warrant charging statutory detention,. to which he entered a plea of former jeopardy, which was sustained and followed by an order of dismissal.

Mrs. Rhea, testifying .for appellant, was permitted to recount that in November, 1930, Mrs. Davis came into the barn, "tired like she had been running," and Nelson. followed her in and said something to Mrs. Davis, and that she ordered Nelson to leave. This witness also testified that when appellant informed her of the killing of Nelson, she said "tell John that she had shot his damned old daddy," which statement appellant said she did not remember to have made, claiming that she was. very much excited.

The evidence adduced by the commonwealth is brief, necessarily being confined to testimony detailing physi-- cal facts showing that the son upon learning of his father's death went at once to the place where he had fallen. He found his father's body three or four steps across the private road "lying in the direction of home" and, as he judged between 18 and 20 steps from the front door of the Davis home. The deceased was in a kneeling position with his hands and nose on the ground; "he still had on his glasses, and his head was toward his. home." Persons, quite a number of them testifying, ex- amined Nelson's body after it had been taken home, and all of them agree that the shot took effect in his back, the bulk of the charge entering the small of the back at a point where his "overall straps crossed"; scattering

shot entered his body from his neck to his waistband, perhaps a few being noticed in and about the head. A number of prosecution's witnesses describe wounds about the head of deceased as being different in appearance from the gunshot wounds. It is argued by counsel for appellant that the presence of these wounds showed conclusively that appellant had struck Nelson with the saw handle while he was in the house. The sheriff who visited the Davis home the morning after the homicide, which occurred about 2 or 2:30 the previous afternoon, arrested appellant and made some observations, the result of which, as far as his testimony is concerned, throws very little light on the subject. He examined the spot where it was indicated deceased fell, and estimated it to be about 18 steps from the point where appellant says she was standing when the shot was fired. The officer asked her how it happened, and, from his recital, she told him in about the same words she used in giving her version on the witness stand. When he asked her why she had shot Nelson, she replied, "I will tell that on the day of the trial." Quite a number of witnesses were introduced who testified that appellant did not bear a very good reputation. It was shown that appellant was about 36 years of age; the deceased about 76, a small man, in good health, and quite active for one of his age. He had poor eyesight and wore glasses.

In support of the motion for a new trial counsel for appellant filed twenty or more grounds which, however, are reduced in argument to about five in number, and following our rule we shall only direct attention to those, which, when summarized, are substantially as follows:

(1) The verdict is flagrantly and palpably against the evidence.

(2) The court erred in admitting incompetent evidence as follows:

(a) Permitting the sheriff to testify to statements of appellant allegedly not voluntarily made.

(b) In permitting testimony of character witnesses to stand after the failure to give a basis for such testimony.

(c) Evidence of character witnesses not limited as to time.

(3) Attorneys for commonwealth were permitted to ask questions inferential of facts not proven.

(4) Improper conduct and argument of attorneys for commonwealth during the progress of the trial because of which the jury should have been discharged.

As to ground (1) we cannot say in face of the proof, as we gather it from the record, that the verdict is flagrantly contrary to the evidence. Appellant admits that she fired the shot which killed deceased, and this being true, it became incumbent upon her to produce evidence which would excuse her act. She undertook to do so, and it then became the province of the jury to weigh the evidence and draw its own conclusions. Her theory of the case was placed before the jury in an instruction which has not been subjected, nor is it subject to criticism. In this state of case we cannot supplant the jury and say that it rendered an improper verdict. Hatfield v. Commonwealth, 264 Ky. 72, 95 S. W. (2d) 562.

It is urged in ground No. 2 that the sheriff over objection was permitted to recount statements made by appellant to him shortly after the homicide, in which statements she detailed to him the manner of, but not her reason for shooting Nelson. It is contended that this procedure was contrary to what is commonly called our "anti-sweating act," but nowhere do we find evidence tending to show that she was coerced; her statements were voluntary. A greater part of the sheriff's evidence was admitted without objection, but if each and every question and answer had been under protest we would still be of the opinion that the testimony was admissible. All of it, except in one immaterial instance, was in substance the same as appellant gave in her testimony.

The court permitted the gun and shell, admittedly used by appellant, likewise several articles of clothing worn by deceased on the day of the homicide, to be introduced in rebuttal. The procedure was objected to, and it is now contended that such procedure was error. It was the purpose in presenting the clothing to demonstrate to the jury the fact that Nelson had been shot in the back, and this was its effect, but a survey of the record shows that a number of witnesses who had viewed the body, some of whom had prepared it for burial, testified that Nelson was shot in the back, and this physical fact stands uncontroverted.

Regardless of whether or not this so-called rebuttal

evidence should have been introduced as direct evidence, we express the opinion that its introduction at the time was a matter entirely in the discretion of the court, Section 224 Criminal Code, and in the light of the positive and undenied testimony that Nelson was shot in the back, we can see no prejudice to the cause of appellant. Tetterton v. Com., 89 S. W. 8, 28 Ky. Law Rep. 146; Truax v. Com., 149 Ky. 699, 149 S. W. 1033; Moore v. Com., 143 Ky. 405, 136 S. W. 608.

Coming now to (b) and (c) of ground No. 2, it is argued that the court erred in permitting witnesses to testify as to the reputation of appellant without same being limited as to time; failed to give the basis of their beliefs, and permitted the witnesses to testify in rebuttal on this subject. The court did not err in permitting the character evidence to come in at the time it was offered. In fact it is only permissible after the defendant offered herself as a witness, and then only for the purpose of challenging credibility. This contention has been determined adversely to counsel's views in many cases. See Bennett v. Com., 171 Ky. 63, 186 S. W. 933, and cases cited.

The court in this case was extremely careful to admonish the jury that such testimony was to be considered by the jury only as affecting her credibility as a witness, if it did have such effect, and to be received for no other purpose. In the case of Shell v. Com., 245 Ky. 223, 53 S. W. (2d) 524, 528, we said:

"The time to which this evidence relates is as of the day the defendant testifies, and a reasonable period theretofore, provided it is shown that such character of reputation has been practically continuous. It is the duty of the court to admonish the jury the purpose for which the evidence is introduced."

An analysis of the testimony as to appellant's general moral character shows that some 14 witnesses testified, all saying in effect, that her reputation measured by what her neighbors said, was bad. In many instances the inquiry, besides testing the moral character, included the expression "good citizenship," and of this inclusion much complaint is made in brief. The term above mentioned is perhaps too broad, and is not in conformity to the question directed by the Code, but the use thereof did not prejudice the rights of appellant, since it is ap-

parent that the witnesses all understood that they were to give their opinions as to her general reputation, and the court by proper admonition in every instance limited its consideration by the jury to her credibility.

Great stress is laid on the contention that in the closing argument of counsel for the commonwealth he indulged in much inflammatory language and made arguments that were not justified by the evidence, all of which were as appears from the record, met with timely objection, and exceptions to the court's rulings. There are copied into the transcript more than ten pages of argument which counsel contends was entirely out of place, and had the effect of seriously prejudicing the substantial rights of the appellant.

We shall not attempt to quote here the parts of the argument as are stressed in brief, but it is sufficient to say that we have examined the record closely on this particular contention, and while not fully approving of some of the remarks made, we are unable to reach a conclusion that the jury was prejudiced in any manner by the remarks, some of which may have been justified by the argument of counsel for appellant.

Here we have a case where according to appellant's version she did not at the time of firing the shot find herself in apparent imminent danger. She had closed and locked the rear door; she had successfully ejected the intruder; a locking of the front door would have enhanced her safety, but she adopted the plan of shooting her adversary and then in the back, at a time when she was in a reasonably safe position. The real question in the case was submitted under an appropriate (self-defense) instruction, and the jury had the sole power to pass on the question of her innocence or guilt.

Judgment affirmed.